Nichols, C. J.,
dissenting. My conception of the law of the instant case is so radically different from the view entertained by the majority of the court, and the importance of the question involved is so obvious, that for the second time since occupying a position on this bench I am impelled to set out in some detail the basis of my dissent.
The judgment entered herein destroys absolutely all post-nuptial contracts made between husband *26 and wife living together, and throws grave doubt on the validity of such contracts between husband and wife living apart, but still undivorced. There is every reason to believe that ‘there are many executory contracts of both varieties existing in Ohio.
In my judgment, any fair construction of Sections 7999 and 8000, General Code, would require an affirmation of the judgment of the court of appeals of Belmont county, which in its turn had affirmed the judgment of the court of common pleas of the same county.
If Section 7999 átood alone, all would agree that the contract entered into between defendant in error’s intestate and her husband was a valid transaction and should be enforced.
The limitation set forth in the first clause of Section 8000, General Code, is given so broad and controlling an effect in the majority opinion as to substantially nullify the grant of power in Section 7999, General Code. This clause reads “a husband and wife can not by any contract with each other alter their legal relations.” A majority of the court are giving the language of this clause such construction and such force as to ignore the real legislative purpose of Section 7999, General Code, while the construction I seek to give it, I most respectfully submit, gives effect to both sections and makes out of the two sections a harmonious whole.
It is well to recall the underlying motive for the passage of the “Married Women’s Act” of 1887.
As a matter of history the legislation was heralded at the time as the emancipation .of the *27 female in her relation not only to her husband’s property but also as to what was theretofore termed her “separate estate.” In respect to each other’s property, husband and- wife were put on an absolute equality. The wife in respect to her power of entering into contracts generally was not only to be on a parity with men, but she was endowed with all the contractual privileges of a feme sole.
The Old World theory of the husband being “lord and master” was supposedly given a knockout blow. True, it was provided by Section 7996, General Code, that '“the husband is the head of the family,” and that the choice of any reasonable place or mode of living for the family was his, to which “the wife must conform,” but here the dominion of the male was to cease.
It is to be admitted, of course, that the judgment of the court in case at bar does not in principle disturb the equality of the law as between husband and wife, for manifestly the disability laid upon the woman here would in sóme other case be visited on the man; but in practice an inequality is created. In the greater number of instances the woman would be the beneficiary of such contracts, for the reason that in post-nuptial contracts, as a rule, it is the man and not the wotfian that is the owner of the property in respect to which the contract is being made. Therefore, if it was the intention of the general'assembly to legalize contracts such as we have here under review, the judgment of this court in invalidating them constitutes a backward step in respect to the domestic relations.
*28 The matter in hand is wholly one of interpretation of the legislative mind. Direct authority in Ohio or elsewhere is practically negligible.
It would be hard to conceive of language more simple and comprehensive than that found in Section 7999: “A husband or.wife may enter into any agreement or transaction with the other * * * which either might if unmarried.” So it is written. When the defendant in error’s intestate, Sarah' A. DuBois, the wife oí John DuBois, engaged to accept $25,000 in full of all her claims as the widow, should she survive her husband, she was acting wholly within the letter of the law. If this was the “all in all” of the law, everyone would concede the validity of the note in suit, just as much as if Sarah A. DuBois had loaned John DuBois $5,000 and taken his promissory note as an evidence of the debt.
No ambiguity exists, no failure to clearly express the purpose oí the general assembly. And, too, there can be no question raised as to the authority of the general assembly to legislate on the subject. Marriage is a civil contract; it is a creature of the law. The creator can impose such reasonable conditions as in its wisdom seemeth proper. It could provide that no engagement or contract between husband and wife could have binding force or effect. On the contrary, it opened wide the doors, and empowered them to contract with each other as though they were strangers. After granting this sweeping power, with all the radical change it suggested, it is to those familiar with the construction of our laws easy to understand how the next sue *29 ceeding section, (8000, General Code), was given form and substance. To the mind of the cautious legislator the thought no doubt occurred that, under the terms of Section 7999, General Code, husband and wife might possibly engage- with one another to dissolve the marital relation, and so, ignoring -the statutes on the subject of divorce, create a condition in society satisfying the most advanced advocates of free and easy marriage and divorce. The simple, statement of such a possibility must have suggested the imposition of a statute of limitation and restraint. Thus Section. 8000, General Code, was conceived and enacted into law. By its express terms contracts in alteration of their legal relations were forbidden. In the light of Section 7999, what can we say is the real meaning of “alter- their legal relations” as employed in Section 8000? We cannot ascribe to the general assembly the purpose of giving in one word and withholding in the next. I am confident that the term in question was used not with regard to property, or contracts in respect thereto, but had to do wholly with the marriage status. It was as if the general assembly had said to the husband and wife, for whose joint benefit it was legislating, you are -free, contract with one another or with strangers. Buy one another’s property, loan one another of your money, engage in business generally. Do these things as if you were unmarried. All these rights and privileges are yours — but in one thing — one sacred and important matter, you cannot act. You cannot of your own choice or whim dissolve the contract which has made you man and wife. The law that *30 authorized the taking of the marriage vows reserves to itself the power of canceling the contract of marriage.
At this point, let us visualize the scene in the legislative halls. Some legislator, wiser than his fellows, suggests that perhaps the brake is being set a little too tight, and proposes that while divorce ought not be the subject of mutual agreement, and accomplished at will, yet there ought to be some provision that something less than a divorce, for instance an immediate separation, might well be the subject of mutual agreement. This exception is thereupon incorporated and becomes a part of Section 8000, General Code.
There is another section of the General Code which emphasizes the intention of the general assembly to give to a married person the full and unrestricted right to contract with respect to property without any of the fetters theretofore existing. Section 8001 provides that “a married person may take, hold and dispose of property, real or personal, the same as if unmarried.” This section immediately follows the section prohibiting the alteration of the legal relations of man and wife and constitutes an express reiteration of the authority granted in Section 7999, General Code, and is, I believe, a special legislative construction of the term “can not * * * alter their legal relations,” in line with the views expressed in this dissenting opinion.
I desire to call special attention to Section 8608, General Code, formerly Section 4189 of the Revised Statutes of Ohio. As a part of the act *31 under review, Section 4189 was repealed and reenacted in identical terms. There could have been no possible reason for thus repealing and then reenacting a section of our statutes except to accommodate the husband’s interest in the wife’s land, and all rights respecting the same, to that of the wife in the husband’s land. A new situation had been created. The estate by courtesy was abolished and a universal dower estate established.
Section 8608, General Code, expressly authorizes husband and wife to enter into a contract with respect to dower interest in the property of the other. Under this section the conveyance, so far as the grantor is concerned, is an absolute-and irrevocable one. The grantee alone has power to render it nugatory by demanding dower and waiving title to the property so conveyed.
Section 8608, General Code, then directly authorizes husband and wife to enter into a contract with respect to each other’s property, which Section 8000 just as directly forbids, as the same is construed by a majority of the court.
If it be granted that there is some doubt as to the'meaning to be given the term “can not * * * alter their legal relations,” I repeat that there is no doubt as to the meaning of Section 7999, General Code. These two sections are dealing with the same general subject, and I therefore am justified in invoking the well-known rule of construction that if there be found two conflicting provisions of the law, one ambiguous the other clear, the provision clearly setting forth the legislative intention *32 shall be preferred and the ambiguous section disregarded.
Enough on the question of intention and construction. For a moment let us enter the wider field of public - policy. I insist that the effect of the judgment of the majority will result in a more frequent resort to the divorce courts by husbands and wives dissatisfied with respect to property. Among the causes leading to marital troubles, none is more prolific than disputes having to do with property rights both in praesenti and in futuro. These controversies are often subject to adjustment through contracts of the kind here under review. Such parties are now informed that all such contracts are invalid, and if validity is to be had, as a condition precedent you must first be divorced.
Many married péople are able to avoid the divorce courts, choosing to endure hardships, sometimes for the sake of mere appearance, and more often for the sake of sparing their children added sorrow and disgrace. I greatly fear that we are making it harder for people so situated, and the complication now added will prove to be the traditional “straw that broke the camel’s back.”
It is my belief that the general assembly in striking the almost feudal shackles from women, in the “Married Women’s Act” of 1887, was actuated by a strong and wholesome purpose of thwarting instead of encouraging divorce.
For the reasons hefe assigned, I favor the affirmation of the judgments of the lower courts.